United States District Court
Southern District of Texas
**ENTERED**
April 20, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSHUA HERRIDGE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-4259 |
| | § | |
| MONTGOMERY COUNTY, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are dueling summary judgment motions. Montgomery County (the "County") and Jimmy Williams (collectively the "Defendants") have moved for summary judgment (Doc. No. 34) and the plaintiff Joshua Herridge ("Herridge") has responded (Doc. No. 39). In addition, Herridge has moved for summary judgment (Doc. No. 35), the Defendants have responded (Doc. No. 38), and Herridge replied (Doc. No. 40). After considering the motions, briefing, summary judgment evidence, and applicable law, the Court grants the Defendants' motion and denies the Plaintiff's motion.

### I.    Factual Background

The following facts are undisputed unless otherwise noted. Joshua Herridge is a pastor at the Pentecostal Lighthouse church in Livingston, Texas. (Doc. No. 34, Ex. 1 at 1). He identifies as "a Christian who is compelled to go out in public and tell others about the merits of his religious beliefs." (Doc. No. 1 at 3; *see also* Doc. No. 35, Ex. 1 at 4). According to his complaint, Herridge "maximize[s] his evangelistic opportunities" by travelling to "public areas near well-attended events," such as public events and music concerts (Doc. No. 1 at 3). At issue in this case is Herridge's ability to stand on a specific sidewalk and grassy hill close to an intersection near the

entrance of the Cynthia Woods Mitchell Pavilion (the "Pavilion") in The Woodlands, Texas.[1] (*Id.* at 4).

In May 2019, the Pavilion hosted a ZZ Top concert outside of which Herridge intended to preach at least in part because "[t]here's much sin that goes on there." (Doc. No. 34, Ex. 3 at 24). Herridge wanted to stand at the southwest corner of the intersection of Lake Robbins Drive and Six Pines Drive in front of a sign for the Pavilion near its entrance. According to Herridge, that location "would be an ideal spot because he could share his message without getting in anyone's way." (Doc. No. 1 at 5).

When he arrived, Herridge notified officers of his plans to stand and pass out literature on the sidewalk and surrounding areas of the intersection, and an unidentified officer told Herridge that he could not. Herridge asserts that the reason he was given was that the property was privately owned. The supervising officer, Jimmy Williams ("Williams"), was then called to speak to Herridge.[2] Herridge took video of his interaction with Williams that has been submitted as summary judgment evidence and reviewed by the Court. (*See* Doc. No. 34, Ex. 4; Doc. No. 37). Williams presented himself as a police officer, wore a polo shirt with the word "POLICE" on it, and carried a radio and firearm. Williams asked Herridge to move across the street. First, Herridge asked Williams whether the property was publicly or privately owned and Williams informed Herridge that the township of The Woodlands and the Pavilion jointly owned the property. Herridge offered to move down the sidewalk closer to the Pavilion, but Williams informed

---

[1] The parties agree that, while the Pavilion itself is jointly owned by the township of The Woodlands and the Cynthia Woods Mitchell Pavilion, the "sidewalk and grassy curtilage area bordering the roads around the venue are public property." (Doc. No. 34 at 3; *see also* Doc. No. 35 at 9).

[2] Williams is the Fire Marshal for the County and a licensed law enforcement officer. (Doc. No. 12 at 3).

2

Herridge that he could not because then Herridge would be on property owned exclusively by the Pavilion (no party has submitted evidence on whether that statement was true).

Williams directed Herridge to go across the street to the northeast corner of the intersection to convey his religious message. The dispute was clearly over the location of Herridge's preaching and not the fact that he was preaching or the content of his message. Herridge told Williams that it was "not right" and "illegal" for Williams to not let him preach. Williams told Herridge that Herridge was "obstructing a law enforcement operation" and insisted that Herridge move. Herridge was dissatisfied with this alternative location because he felt that he could reach more people with his message in front of the Pavilion than across the street.

After more unsuccessful arguing and debating, Herridge asked Williams if he would be cited or arrested if he did not leave the southwest corner. Williams did not directly answer that question but did respond, "Right now, you're in an area where they don't allow any solicitation, they don't allow anybody to congregate. The reason we don't do that is because now you're impeding the operation" and expressed concern for public safety regarding the crowds of pedestrians and vehicular traffic at the intersection. Williams then asked Herridge to "cooperate" and go across the street; Herridge responded that "if you'll give me the lawful order to leave, I'll walk away." Williams finally said, "Go ahead and walk away. I'm giving you an order to leave." When Herridge then asked for Williams's name, Williams gave it and then reiterated that "I've given you the order. You asked for it. Walk away." As Herridge walked away he said, "I'll deal with it later then." Herridge then continued preaching from the northeast corner of the intersection but left after 20 minutes because he found that location "futile."

3

## II.     Procedural History

In June 2019, Herridge's attorney sent a letter to the County claiming that the County's "banishment of Herridge from the public sidewalks on the border of Lake Robbins Drive and the Pavilion violates his constitutional rights." (Doc. No. 35, Ex. 1 at 26). The County responded that it did not believe Williams had violated Herridge's rights and informed Herridge's attorney that "the area circled in red [see below] is where the pedestrian traffic merges from the two primary parking locations, and it has been the policy of the officers to never allow any person to gather there because they will obstruct the pathway or slow the movement of pedestrians." (Doc. No. 34, Ex. 5 at 2). The County attached the following image, which both parties have referenced in their briefing and agree is an accurate portrayal of the intersection:



(*Id.* at 4). The County further stated:

> The officers do not allow any sort of activity within the red circled sidewalks, whether it is religious speech, ticket sellers, food and drink vendors, or any other activity that obstructs the sidewalk or causes safety issues . . . when events are taking place at the Cynthia Woods Mitchell Pavilion.

. . .

> The green areas are where vendors, etc. are permitted to gather and interact with the crowds, as it does not create a safety issue at those locations.

(*Id.* at 2–3). This statement generally encompasses what Herridge refers to as the County's "organized activities" policy (the "Policy"). Herridge's attorney replied that Herridge only wanted to "hand out literature and display a sign" in the red-circled area, which he contended "cannot possibly cause obstruction." (Doc. No. 35, Ex. 1 at 31). Nevertheless, the County insisted that "allowing anybody to set up on that side of the street where the Pavilion is during an event constitutes a risk to public safety" and informed Herridge's attorney that "if Mr. Herridge attempts to conduct activities from the area he was asked to move from on May 18, 2019 again during an event, he will again be asked to move back across the street." (*Id.* at 33).

In October 2019, Herridge filed this lawsuit against the County and Williams, in both his individual and official capacities. (Doc. No. 1 at 1–3). The complaint alleges violations of Herridge's First Amendment right to freedom of speech and his due process rights under the Fourteenth Amendment.[3] (*Id.* at 9–11). The cause of action is under 42 U.S.C. § 1983. (*Id.* at 1). Herridge seeks: (1) a declaratory judgment that the Defendants' actions and the Policy are unconstitutional; (2) a preliminary and permanent injunction against Defendants from applying or enforcing the Policy, including against Herridge; (3) $1 in nominal damages; and (4) attorney's fees and costs under 42 U.S.C. § 1988. (*Id.* at 11–12).

Previously, this Court denied Herridge's motion for a preliminary injunction, denied the Defendants' motion to dismiss for lack of standing, and granted Herridge's motion to strike the Defendants' jury demand. (*See* Doc. No. 31). Further, in hopes that a neutral party could facilitate

---

[3] Herridge's due process argument is that "Defendants' policy is vague and lacks sufficient objective standards to restrain the discretion of police officers[,]" which gives Defendants the "opportunity to curtail disfavored speech in an ad hoc, arbitrary, and discriminatory manner." (Doc. No. 1 at 10–11).

a quick and amiable solution, the Court ordered the parties attend a mediation before the magistrate judge. (*See* Doc. No. 22). The parties attended mediation before Judge Stacy, but failed to reach a settlement. Now, apparently agreeing on all material facts, both parties have moved for summary judgment.

### III.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### IV.    Analysis

The summary judgment evidence was helpful to the Court in focusing on the factual background and the disputes on the law. Both Herridge and Officer Williams were factually

correct. Herridge positioned himself on the corner he did because it exposed him (and presumably his message) to the greatest number of pedestrians because that corner had the greatest foot traffic. Williams and his officers, who were directing traffic and providing for the safety and security of the concert patrons as they approached the Pavilion, were obviously concerned about foot traffic tie-ups at the very location Herridge chose because a tie-up would back pedestrians back onto the street and into possible danger.

Additionally, both Herridge and Williams acted with respect for each other and accorded themselves with the level of behavior, while maintaining their principled positions, that one would expect from individuals holding their respective positions.

That being said, 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A claim made under § 1983 has two elements: (1) the conduct complained of was committed by a person acting "under color of" state law[4]; and (2) the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970). Herridge claims that the undisputed facts show that he has conclusively proved both of these elements. According to Herridge, Williams, while acting under color of law, violated Herridge's First Amendment free speech rights and

---

[4] The fact that Williams was off-duty and doing work for the Pavilion at the time of the incident is not dispositive of this element because "[w]hether an officer is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010). Instead, the court considers "(1) whether the officer misused or abused his official power and (2) if there is a nexus between the victim, the improper conduct, and the officer's performance of official duties." *Id.* (cleaned up). Nevertheless, Williams has admitted that the actions he took were "committed under the color of state law and authority," (Doc. No. 12 at 3), so this element of Herridge's claims is conceded as to Williams.

Fourteenth Amendment due process rights. Further, Herridge argues that Williams's actions were pursuant to the County's unconstitutional policy, so that the County is liable as well. Before addressing the merits of these arguments, however, the Court will address the Defendants' motion.

## A.    Qualified Immunity for Williams

First, Williams claims that he is entitled to qualified immunity from Herridge's suit. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has prescribed a two-step process for courts to determine whether an officer is entitled to qualified immunity. *See id.* First, the court should determine if the facts show a violation of a constitutional right. *Id.* If so, the court must decide "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* "At summary judgment, it is the plaintiff's burden to rebut a claim of qualified immunity once the defendant has properly raised it in good faith." *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

Here, Williams argues that Herridge is unable to overcome even the first prong of qualified immunity—Williams contends that there was no constitutional violation at all. Further, while the Supreme Court no longer requires courts to decide whether a right was violated before deciding whether it was clearly established, *see Pearson*, 555 U.S. at 236 (2009), the Court has also recognized that doing so is still "beneficial." *Id.* None of the circumstances described in *Pearson* that justify bypassing the first prong of the analysis are applicable here. For example, Williams's qualified immunity defense has been asserted at the summary judgment stage, not the pleading stage when the factual basis would not be fully developed, and any constitutional decision here

does not rest on an "uncertain interpretation of state law." *Id.* at 238–39. In addition, this is not a case in which the "constitutional question is so factbound that the decision provides little guidance for future cases" or one where the parties will be unduly burdened by litigating a constitutional question. *Id.* at 237. Instead, the parties agree on the most pertinent facts underlying the constitutional question, have fully briefed the issue of whether Williams violated Herridge's constitutional rights, and both seem eager for resolution of the issue. Consequently, the Court will resolve the constitutional question.

### 1.     Did Williams violate Herridge's First Amendment rights?

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1). To determine whether a government action violates the First Amendment, the Court must: (1) assess whether the nature of the plaintiff's activities deserve First Amendment protection; (2) identify the type of forum involved; and then (3) determine whether the government's justification for the restriction satisfies the appropriate standard. *Watkins v. City of Arlington*, 123 F. Supp. 3d 856, 863 (N.D. Tex. 2015) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797 (1985)). Here, the parties agree that Herrdige's speech, in the form of preaching, leafleting, and holding signs, is considered protected speech under the First Amendment. (*See* Doc. No. 39 at 7; Doc. No. 34 at 8) Further, the parties agree that the grassy area and sidewalk around the Pavilion where Herridge wants to preach constitutes a public forum under First Amendment law.[5] (*See* Doc. No. 34 at 8).

---

[5] Governmental entities are most limited in their ability to restrict or regulate private speech in "traditional public fora," *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009), because they "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

In addition, Herridge does not contend that the restriction on his speech was content-based. (*See* Doc. No. 35 at 17; *see also* Doc. No. 34, Ex. 3 [Herridge's Deposition] at 45 [Q: "Do you believe that the content of your activity or your speech was the reason why you were asked to move on May 18th, 2019?" A: "I have no reason to believe that."]). Further, the summary judgment evidence shows this to be true. (*See* Doc. No. 34, Ex. 5 at 2–3 [letter informing Herridge that the Policy does not allow "any sort of activity"]; Doc. No. 34, Ex. 1 [Williams's affidavit]). When speech regulations are content-neutral, a less exacting level of scrutiny than strict scrutiny applies. "[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so." *Doe I v. Landry*, 909 F.3d 99, 111 (5th Cir. 2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Stated differently, "to pass constitutional muster, a time, place, and manner regulation must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Denton v. City of El Paso, Tex.*, 475 F. Supp. 3d 620, 632 (W.D. Tex. 2020) (cleaned up).

There is a dispute between the parties as to whether the Policy was promulgated by the Pavilion or by the County, but regardless, it is this policy that Williams, while acting under color of law, applied against Herridge, so the Court must subject it to First Amendment scrutiny.

### a.  Whether there is a significant government interest

First, the Defendants must show that the Policy serves a significant government interest. They argue that the government interest is that in public safety. According to the Defendants, both in argument and in summary judgment evidence, the Policy is meant to ensure that foot traffic does not stop in busy areas around the Pavilion. The evidence shows that, when there is congestion

of the concert crowd in front of the Pavilion, pedestrians may "spill out into the street . . . creat[ing] an unacceptable risk for accident, injuries and death to pedestrians and motorists alike." (Doc. No. 34, Ex. 1 at 1). Herridge acknowledges that public safety and obstruction avoidance are "generically" significant interests, (*see* Doc. No. 39 at 6 (citing *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 434 (5th Cir. 2006)), and does not dispute that the Defendants have a significant interest in protecting public safety, so this element is conceded, and the Court sees no need to address it further.

### b. Whether the policy is narrowly tailored

Next, the Defendants must show that the Policy is narrowly tailored to serve the government interest described above. *See Denton*, 475 F. Supp. 3d at 632. "If 'a substantial portion of the burden on speech does not serve to advance' the ordinance's stated goals, then the ordinance is not narrowly tailored." *Knowles*, 462 F.3d at 434 (quoting *Ward*, 491 U.S. at 799). Nevertheless, this does not mean that the policy must be the "least restrictive or least intrusive means" of protecting public safety. *Landry*, 909 F.3d at 111. A time, place, or manner restriction is "narrowly tailored" where "a substantial government interest . . . would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985). In support of their contention that the policy is narrowly tailored, the Defendants point to the following facts: (1) the policy applies only to the one-block portion of sidewalk and grassy curtilage on the south side of Lake Robbins Drive, between Six Pines Drive and Pavilion property[6]; (2) the policy specifically allows

---

[6] This fact is agreed to by the parties. (*See* Doc. No. 35 at 9; Doc. No. 38 at 9).

11

for organized activities across the street from the Pavilion on other corners of the intersection[7]; and (3) the policy was only in effect when the Pavilion had its largest events.[8]

In addition, the Defendants have provided evidence that Herridge's preaching does cause traffic congestion. Williams stated in his affidavit that he had seen Herridge previously and that Herridge's "public sermons do tend to make people stop or slow down to listen or at least try to figure out what this person is talking about." (Doc. No. 34, Ex. 1 at 2). In addition, Herridge himself acknowledged that it is not uncommon for people to stop and listen to what he says when he is preaching, both in general and specifically when he has preached at the Pavilion. (See Doc. No. 34, Ex. 4 at 16–17 [stating that passing vehicles would stop and listen to him when he preached outside his church in Livingston, Texas]; id. at 25–26 [recalling that he once had a physical altercation at the Pavilion when a passerby hit him in the back of the head]; id. at 30 [stating that he has had "hundreds" of people stop to listen to him preach at various events]). According to Williams, when there are many people arriving to a large event at the Pavilion and people stop or slow down, it "creates the danger of congestion and causes risks to public safety if it takes place in the congested areas on the pathways southwest of the intersections where the Officers are working to keep pedestrians moving to the main gates." (Doc. No. 34, Ex. 1 at 2).

---

[7] This fact is also agreed to by the parties. (See. Doc. No. 35 at 8; Doc. No. 38 at 9).

[8] The parties apparently dispute the precise contours of this fact. (See Doc. No. 39 at 8 n.2; Doc. No. 38 at 9). The Defendants have provided summary judgment evidence from Williams indicating that the Policy is enforced only at the Pavilion's largest events. (See Doc. No. 34, Ex. 1 [Williams's affidavit] at 2 ["During smaller events, Officers do not work in the Six Pines / Lake Robbins intersection as there is less concern about obstruction of the pathway in question."]; Doc. No. 34, Ex. 2 [Williams's deposition] at 65 [Q: "Just to be clear, is there a certain threshold where the location that Mr. Herridge wants to perform his activities at where you wouldn't stop him automatically? What threshold of event would that normally occur?" A: "It would generally be an event 7,500 or less where we weren't manning that intersection and we wouldn't be aware of that activity unless it caused an obstruction."]). Herridge points to other testimony from Williams where he states that, if there is a complaint and an "obstruction," Williams would apply the Policy regardless of crowd size. (Id. at 36). This testimony is not contradictory. The officers man the intersections at large events and enforce the Policy. At smaller events, they do not man the intersection and would only ask someone to move if a complaint is reported. Either way, this is still evidence that the Policy is "narrowly tailored," as will be explained below and does not create a material fact issue.

These facts all indicate that the policy is narrowly tailored to the risk "that any stoppage of the flow of pedestrians or vehicles, or any crowds congregating anywhere in the restricted areas, could cause pedestrians to spill out into the street and create a public safety issue." (*Id.* at 1). Williams has observed, and Herridge has acknowledged, that pedestrians are likely to stop to listen to Herridge's preaching. It is reasonable that, when a large event is happening at the Pavilion and many people are descending upon the venue, officers need the pedestrian traffic to keep moving out of the intersection in an orderly way. At smaller events this goal is less important because fewer people means less congestion, and the officers do not prohibit all organized activities in the area around the Pavilion. The policy is narrowly tailored to the government's interest in public safety.

Herridge relies heavily on *Knowles v. City of Waco, Tex.*, in his attempt to argue otherwise. 462 F.3d 430 (5th Cir. 2006). There, the Fifth Circuit struck down a City of Waco ordinance that prohibited all "street activity" within a school zone during school hours. *Id.* at 432. The court held that the ordinance was not narrowly tailored to its goals of protecting school children and citizens on public roads because its broad definitions could end up criminalizing activities as benign as "just two individuals standing or sitting in one place." *Id.* at 435. Further, the ordinance's wording added "troublesome layers of uncertainty" in that "no one can be certain what conduct it cover[ed]." *Id.*

Here, the Policy is distinguishable. While it may also be broad enough to cover various forms of expressive activity, the Policy is much more narrowly tailored geographically and temporally. Where the Waco ordinance in *Knowles* applied to all school zones, this policy applies only to one block immediately surrounding the Pavilion where there are busy intersections. In addition, the ordinance in *Knowles* was enforced at all hours that school was in session, so

expressive activity could be criminalized even when it was unlikely that there would be any people who would be distracted by expressive activity, thus endangering others. In contrast, the summary judgment evidence shows that this policy is only enforced when there are large events at the Pavilion with many attendees. The Fifth Circuit held that the Waco ordinance was too broad to be considered "narrowly tailored to prevent distraction of motorists when school zone rules are in effect." *Id.* at 435. In contrast, the limitations on the policy that Williams enforced against Herridge all serve to tailor the policy only to expressive activity that is likely to cause pedestrians to stop, and only at times that such stopping could pose significant risks to public safety. The policy does not burden substantially more speech than necessary to achieve its goals of ensuring that pedestrian and vehicular traffic keep moving safely in the area around the Pavilion during a large event, and that goal would be "achieved less effectively absent the [Policy]." *Albertini*, 472 U.S. at 689.

      c.      **Whether the policy leaves ample alternative channels for communication**

Even when a content-neutral regulation of speech is narrowly tailored to serve a significant government interest, it still must also leave open alternative channels of communication to survive First Amendment scrutiny. *See Ward*, 491 U.S. at 798. The First Amendment protects the right of every citizen to "reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981). Nevertheless, the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Id.* at 647. Herridge compares the policy at issue with one that the Supreme Court struck down in *Schneider v. New Jersey*, 308 U.S. 147 (1939). There, the Court held that a city's ordinance that prohibited the distribution of handbills in streets and alleys, but not other public places, did not reserve ample alternative spaces for expression, and was therefore unconstitutional. *Id.* at 163. The Court reasoned that the

14

prohibition failed to preserve the cities' public arteries as the "natural and proper places for the dissemination of information and opinion." *Id.*

The Defendants' policy, however, is a far cry from such a draconian measure. Instead, Williams's asking Herridge to move across the street is more similar to, if not less intrusive than, a policy that the Western District of Texas recently reviewed in *Denton v. City of El Paso, Tex.*, 475 F. Supp. 3d 620 (W.D. Tex. 2020). There, the plaintiff attempted to proselytize at a farmers' market and was asked to move pursuant to a City of El Paso policy that disallowed activities that could cause a disruption inside the market, which was in operation within a few city blocks for a few hours each Saturday. *Id.* at 626–28. The court distinguished El Paso's policy from the ordinance struck down in *Schneider*, and instead held that the policy left open ample alternative channels of communication because the plaintiff could reach substantially the same audience of people. *Id.* at 641–42.

Here, the Policy is even more limited than the one reviewed in *Denton*. The touchstone of whether the alternative space for communication is sufficient is whether the speaker can reach a similar audience. *Heffron*, 452 U.S. at 655. As noted, Herridge wants to reach the audience of people attending concerts and other events at the Pavilion. (*See* Doc. No. 34, Ex. 3 at 24). Williams merely asked Herridge to move from the southwest corner of the intersection that is directly in front of the Pavilion to the northeast corner of the intersection. Herridge insists that he cannot reach enough people from this corner because it is an "empty parking lot," (Doc. No. 35 at 21), but Williams testified in his deposition that, at large events like the ZZ Top concert at which Herridge wanted to preach, many people park in that very parking lot and have to cross the northeast corner of the intersection to get to the Pavilion. (Doc. No. 34, Ex. 2 at 60). Regardless of which characterization is correct, a large number of the same people who would walk past

Herridge on the southwest corner would also walk past him on the northeast corner, but with any stopping causing less congestion in the street than on the southwest corner. (*See id.* at 68; Doc. No. 34, Ex. 1 at 2 ["At either of the corners to the east side of the intersection [Herridge's] activities do not cause any concerns as pedestrians are already gathering there in large groups in preparation for being escorted across the intersection."]). Being asked to move to the other side of the intersection "may reduce to some degree the potential audience" for Herridge's speech, but this alone does not render the remaining avenues of communication inadequate. *Ward*, 491 U.S. at 802.

Consequently, the Court holds that the Policy prohibiting Herridge from his activities was narrowly tailored to serve the substantial and content-neutral government interest of reducing pedestrian and vehicular traffic congestion in order to protect public safety. Herridge did not suffer a First Amendment violation when Williams ordered him to move.

There being no First Amendment violation by Williams, the Court need not move on to the second step of the qualified immunity analysis—Williams is afforded qualified immunity against Herridge's First Amendment claim. Nevertheless, the Court acknowledges that, even if Williams did violate Herridge's First Amendment rights, he would still be entitled to qualified immunity because "the right at issue" was not "clearly established at the time of [his] alleged misconduct." *Pearson*, 555 U.S. at 231. As the Court has already recounted, whether Williams violated Herridge's rights is a close call. Courts applying the First Amendment analysis to similar factual circumstances have come out on both sides of the issue. *Compare, e.g.*, *Knowles*, 462 F.3d 430 (finding the city ordinance not "narrowly tailored" enough to pass constitutional muster), *with* *Denton*, 475 F. Supp. 3d 620 (finding no constitutional defect in a similar city ordinance). Therefore, the Court holds that, even if Williams's actions did violate Herridge's First Amendment

rights, Williams would still be entitled to qualified immunity from the claim because such violation was not clearly established at the time of the incident.

### 2. Did Williams violate Herridge's Fourteenth Amendment rights?

Williams is also entitled to qualified immunity from Herridge's Fourteenth Amendment due process claim. "To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Morris v. Livingston*, 739 F.3d 740, 749–50 (5th Cir. 2014). Here, the undisputed facts show that Williams never arrested Herridge; Williams ordered Herridge to walk across the street and Herridge complied. Herridge has not otherwise identified any life, liberty, or property interest of which Williams allegedly deprived him. Therefore, there was no "deprivation" by Williams, and he is entitled to qualified immunity against this claim.

### B. County's Liability

That Williams is entitled to qualified immunity from Herridge's claims does not, in itself, resolve the question of the County's potential liability. *See Owen v. City of Independence, Missouri*, 445 U.S. 622, 638 (1980) (municipalities are not entitled to qualified immunity). The County asserts that it is entitled to summary judgment because the Policy did not constitute state action by the County. (Doc. No. 34 at 13). According to the County, any policy that Williams enforced was the Pavilion's, and not "fairly traceable" to the County. (*Id.*). Herridge responds that the County is responsible for enforcing the policy and, even if the County did not create the policy, it has ratified it and is therefore responsible for it. (*See* Doc. No. 39 at 11–16; Doc. No. 35 at 22–24). Herridge contends instead that he is entitled to summary judgment.

The Court need not resolve the dispute over state action, at least with respect to the alleged First Amendment violation. The same analysis that led the Court to conclude Williams was entitled to qualified immunity from Herridge's First Amendment claim also dictates that the Policy did not violate Herridge's First Amendment rights. Therefore, whether the policy is the County's or the Pavilion's, it does not violate the First Amendment and the County is entitled to summary judgment on the First Amendment claim.

Herridge also claims that the County's policy is unconstitutionally vague. (*See* Doc. No. 1 at 10–11). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Government actors violate the due process guarantee "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

The void-for-vagueness doctrine cannot apply to the complained-of policy because it does not criminalize any conduct. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (recognizing that the "most exacting vagueness standard" applies to criminal statutes and removal cases). Here, at most, the Policy was to ask those engaging in organized activities on the southwest corner of the intersection to cross the street. The consequence for violating the policy is to be ordered to move. (*See* Doc. No. 35, Ex. 1 at 31 [County's letter informing Herridge's attorney that if Herridge violates the policy again "he will again be asked to move."]). Williams additionally testified at his

deposition that, had Herridge refused to comply with his order, he would have consulted with the

district attorney's office and possibly arrested Herridge. (Doc. No. 34, Ex. 1 at 57). At that point,

however, Williams testified that the arrest would have been pursuant to Texas Penal Code § 42.03,

and *not* the Policy. (*Id.* at 56). Texas Penal Code § 42.03 provides:

> (a) A person commits an offense if, without legal privilege or authority, he
> intentionally, knowingly, or recklessly:
> (1) obstructs a highway, street, sidewalk, railway, waterway, elevator, aisle,
> hallway, entrance, or exit to which the public or a substantial group of the public
> has access, or any other place used for the passage of persons, vehicles, or
> conveyances, regardless of the means of creating the obstruction and whether the
> obstruction arises from his acts alone or from his acts and the acts of others; or
> (2) disobeys a reasonable request or order to move issued by a person the actor
> knows to be or is informed is a peace officer, a fireman, or a person with authority
> to control the use of the premises:
> (A) to prevent obstruction of a highway or any of those areas mentioned in
> Subdivision (1); or
> (B) to maintain public safety by dispersing those gathered in dangerous
> proximity to a fire, riot, or other hazard.
> (b) For purposes of this section, "obstruct" means to render impassable or to render
> passage unreasonably inconvenient or hazardous.
> (c) An offense under this section is a Class B misdemeanor.

Tex. Pen. Code § 42.03. If Herridge had refused to move and Williams had arrested Herridge, the

arrest would have been pursuant to the Texas statute, and not pursuant to the "organized activities"

policy. Herridge has not challenged the constitutionality of the Texas statute that actually provides

the criminal penalty as being void for vagueness. The County is therefore entitled to summary

judgment on Herridge's due process claim as well.

## V.     Conclusion

For the foregoing reasons, the Court grants the Defendants' motion for summary judgment

(Doc. No. 34) and denies the Plaintiff's motion for summary judgment (Doc. No. 35).

Signed at Houston, Texas, this _20th_ day of April, 2021.

Andrew S. Hanen
United States District Judge